UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

| UNITED STATES OF AMERICA, | Case No. 3:17-cr-00062-LRH-CBC |
|---|---|
| Plaintiff, | ORDER |
| v. | |
| PETER JAMES CARIANI, | |
| Defendant. | |

Defendant Peter James Cariani has filed a motion to suppress the fruits of four search warrants executed on his email addresses, the email addresses of his girlfriend and brother, and his home residence. (ECF No. 30). Approximately a month after Cariani filed his motion, he filed an additional motion, this time seeking to suppress statements he made during an FBI interview and evidence recovered stemming from that interview. (ECF No. 36). The government filed a consolidated response to Cariani's motions. (ECF No. 40). For the reasons stated below, the Court will deny Cariani's motions to suppress.

## I. Factual Background

The following facts and allegations are gathered from the various pleadings and exhibits on the docket. Cariani is an engineer by trade who worked for Sierra Nevada Corporation ("SNC"), a defense contractor headquartered in Sparks, Nevada, from 2012 to April 2015. Among other products, SNC designs and develops a specialized aircraft radar system known as REVS. REVS provides pilots with digital images of the ground, which allows them to safely land aircraft in low visibility situations. While REVS was originally designed for use on military helicopters during

1

the War on Terror in Afghanistan, SNC saw a potential market for selling REVS for use on commercial fixed-wing aircraft. SNC believed that REVS would be useful for large cargo planes and corporate jets attempting to land in bad weather conditions at smaller airports lacking the sophisticated landing technology of their larger counterparts. SNC has devoted substantial resources into developing a commercial REVS product and considers it to be a trade secret and proprietary information not known to the general public.

Cariani was hired by SNC in 2012 as a Principal Systems Engineer to work in the fixed-wing division of its commercial REVS program. During his employment at SNC, Cariani held a "Secret" level security clearance. Cariani eventually submitted his resignation letter to SNC on April 7, 2015, which contained several complaints about SNC and its leadership. Cariani alleges that he resigned following disputes with SNC management about the direction of his REVS division, but the government alleges that Cariani's dissatisfaction with SNC stems from him being disciplined for unprofessional behavior. Following Cariani's resignation, on April 16, SNC corporate security discovered that approximately 12,000 REVS-related files had been copied from Cariani's SNC-issued laptop to two USB flash drives not approved by SNC. A little over a week later on April 24, Cariani participated in a telephonic exit interview with SNC after refusing an in-person interview. When asked by SNC personnel whether he had transferred any files from his SNC laptop to unapproved external storage devices, Cariani stated that he could not recall if he had done so prior to SNC prohibiting the practice. Further questioning from SNC personnel about the file transfers prompted Cariani to abruptly hang up the phone.

### A. First Motion to Suppress – Search Warrants

The government subsequently initiated a criminal investigation into Cariani to determine if he had stolen any of SNC's trade secrets related to the REVS program. Investigation revealed that in March 2015, Cariani and his girlfriend, Alisa Bindel, had booked a flight to Italy scheduled to depart in late May 2015. While Bindel had traveled to Europe several times before, Cariani had not. Cariani used an email account from Apple (carianip@me.com) to book the flight. On May 26, 2015, FBI Special Agent Sean Jolley applied for a search warrant from this Court to search Cariani's "carianip" email account for various terms related to Cariani and the REVS program,

such as "REVS," "source code," "internal research and development," and the names of both Cariani and Bindel. Agent Jolley also included general information about email accounts in the affidavit attached to his search warrant application, noting that email was often used by foreign governments and businesses to obtain trade secret information. U.S. Magistrate Judge William G. Cobb reviewed Agent Jolley's search warrant, affidavit, and the attached exhibits and granted the warrant.

The search warrant resulted in the discovery of three additional Apple email accounts belonging to Cariani. Agent Jolley applied for and was granted a second search warrant for these three email accounts. The second search warrant, *inter alia*, revealed a document indicating that Cariani had business plans to sell technology similar to REVS to SNC's customers, which included similar pricing and cost specifications. Subsequent search warrants were granted for email addresses belonging to Keith Cariani (Cariani's brother) and Bindel and for a search of Cariani's home.

### B. Second Motion to Suppress – FBI Interview

The Court held an evidentiary hearing on July 29, 2019, regarding Cariani's motion to suppress evidence obtained in an interview he had with the FBI on October 21, 2015, at the Boston Logan International Airport. During the hearing, the Court heard testimony from three individuals: FBI agents Timothy Darling and Emilie Stallings and Cariani himself. Agent Darling, the airport liaison agent coordinator for the FBI at Logan International, testified that he was tasked with meeting Cariani at his airline arrival gate to try to set up a meeting between Cariani and two other FBI agents. Although Agent Darling testified that he did not have any specific memory of his encounter with Cariani, he stated that when he meets with someone whom the FBI wants to interview, he asks the interviewee if he has any time to meet with a "couple of colleagues." If someone refuses to meet with them, Agent Darling allows the individual to leave and asks if they would be willing to schedule a meeting or a phone call at a different time. He does not place his hands on any interviewees, nor does he ever raise his voice. Agent Darling testified that if the interviewee accepts the interview offer, he escorts them through the public terminal and to the FBI office, which is located in a section of the airport only accessible to airport employees and

government personnel. Agent Darling stated that he never puts his hands on someone he accompanies to the FBI office, nor does he ever restrict their movement on the way there. If something unusual happened in the course of Agent Darling's meeting with Cariani, such as Cariani becoming upset or acting belligerently, he would have remembered it. As far as Agent Darling remembered, Cariani accepted the interview offer and accompanied him to the FBI office without incident.

Agent Stallings testified about her interview with Cariani on October 21, 2015, and her subsequent interaction with him the following day. She testified that she and Agent Joshua Cook, who were both based out of Boston at that time, interviewed Cariani on behalf of Agent Jolley. The interview took place in a conference room in the FBI office at Logan International, which Agent Stallings described as well-lighted. Agents Stallings and Cook sat across a conference table from Cariani and conducted what would turn out to be approximately an hour and a half interview. Cariani was seated between the agents and the door leading out of the conference room. Agent Stallings testified that she and Agent Cook did have firearms on them, but they were concealed by their clothing. Agent Stallings was wearing business attire, while Agent Cook was wearing business casual.

Agent Stallings testified that Cariani appeared alert and answered their questions with clear speech and without impairment during the interview. At no time did the agents tell Cariani that he was under arrest or that he was not free to leave. Agent Stallings testified that Cariani asked her and Agent Cook why he was being investigated several times, but they did not give him a specific answer. At no time did Cariani request to leave or otherwise express a desire to terminate the interview. The agents eventually asked for Cariani's consent to search any electronic devices he had on hand, and Cariani initially agreed to allow his laptop, iPad, and two USB flash drives to be searched. But when it came time to sign the consent forms, Cariani changed his mind and only gave the agents permission to search his two USB drives. Following the signing of the consent forms, the agents offered to drive Cariani to bus stop in Braintree (a suburb of Boston) where his parents were waiting to pick him up. Cariani accepted the offer, and the agents drove him to the Braintree bus stop without any conversation or incident.

4

The following day (October 22, 2015), Agent Stallings received word from Agent Cook that Cariani had changed his mind again and wished to give the FBI consent to search his iPad and laptop. Agent Stallings traveled to one of Cariani's rental properties in Framingham along with another agent. Once there, Cariani showed the agents some files on his computer, and in Agent Stallings's words, "rambled" about stealing "something from SNC." Cariani then signed written consent forms to search his laptop and iPad. The entire meeting at Cariani's rental property lasted about 30 minutes.

Cariani's testimony varied greatly from the testimony given by Agents Stallings and Darling. He testified that immediately after he disembarked from his flight, "two men approached him from behind" and showed him their badges identifying themselves as law enforcement. Because he believed that he had no choice but to go with them, Cariani allowed himself to be escorted by the law enforcement officers, with one officer in front of him and one officer behind him. Cariani testified that he was escorted to the conference room in a manner similar to how he believed prisoners of war are escorted by the Marines, but on cross, he conceded that while in the Marines, he had never actually escorted a prisoner of war. When he arrived in the conference room and was greeted by Agents Stallings and Cook, Cariani testified that he believed that he did not have a choice but to answer the questions the agents wanted to ask him, and he also did not feel that he could terminate the encounter. He never asked the agents if he had the option of doing either, however. Although Cariani did not see any firearms, he assumed that Agents Stallings and Cook were armed. Cariani testified that throughout the interview, he repeatedly stated how concerned he was about making his "elderly" parents wait for him at the Braintree bus stop at night, but in response, the agents only told him that the questioning would be "over quickly." Cariani stated that prior to starting the interview, he called his parents and told them what was happening.

After the agents drove him to the Braintree bus stop, Cariani testified that he called his brother, and following this conversation, became "convinced" that the FBI had been tapping their phones. He also called his girlfriend, Bindel, and learned that she had been interviewed by the FBI as well. Cariani stated that he was dealing with "the mob," who he believed was trying to ruin his

life by destroying his relationships with his family and friends and interfere with his job prospects. He testified that the FBI was a "United States government agency that has how [sic] much power they want, and they're after me, and they can do whatever damage to my life they want to." The same night as his interview with Agents Stallings and Cook, Cariani left Agent Jolley three voicemails, wherein he stated his intent to allow the FBI to search his laptop and iPad.

Cariani was eventually indicted by a grand jury on July 26, 2017, with one count of theft of stolen trade secrets and one count of transmission of trade secrets, both in violation of 18 U.S.C. §1832(a)(2). Cariani filed two motions to suppress, one on April 19, 2019 (ECF No. 30) and one on May 18 (ECF No. 36). The first motion to suppress seeks to suppress the fruits of the first search warrant targeting Cariani's "carianip" Apple email. The second motion to suppress seeks to suppress statements that Cariani made to FBI investigators in the October 21, 2015 interview and any evidence obtained as a result of that interview.

## II. Discussion

### A. First Motion to Suppress (ECF No. 30)

Cariani first challenges the validity of the first search warrant issued by Judge Cobb, arguing that: (1) it was not supported by probable cause; (2) it did not satisfy the Fourth Amendment's particularity requirement, and (3) it relied on stale information. (ECF No. 30 at 7). The Court will address these arguments in turn.

#### 1. Probable Cause

Cariani argues that Agent Jolley's affidavit did not establish probable cause because it did not establish a sufficient nexus between Cariani's Apple email account and the charges of theft of trade secrets and transmission of trade secrets. (ECF No. 30 at 15). He states that the only connection that his email account had to the case was that he used it to book a "pre-planned vacation" with his family to Italy, and as such, there was no basis for the FBI to suspect that evidence of the sale of SNC's trade secrets would be found within his email. (*Id.*)

When reviewing the validity of a search warrant, an affidavit in support of a search warrant demonstrates probable cause if, under the totality of the circumstances, it reveals a fair probability that evidence of a crime will be found in a particular place. *U.S. v. Celestine*, 324 F.3d 1095, 1102

(9th Cir. 2003) (citing *Illinois v. Gates*, 462 U.S. 213, 238 (1983)). This standard does not require the affidavit to establish that the evidence is in fact in the place to be searched or even that it is more likely than not to be there. *U.S. v. Elmore*, 917 F.3d 1068, 1074 (9th Cir. 2019). "Rather, the issuing judge 'need only conclude that it would be reasonable to seek the evidence in the place indicated in the affidavit.'" *Id.* (quoting *U.S. v. Fernandez*, 388 F.3d 1199, 1254 (9th Cir. 2004), *modified* 425 F.3d 1248 (9th Cir. 2005)). The issuing judge's finding of probable cause is generally entitled to great deference. *U.S. v. Krupa*, 658 F.3d 1174, 1177 (9th Cir. 2011).

Here, it is clear that Judge Cobb had a substantial basis to conclude that evidence of trade secret theft would be found in Cariani's Apple email account. At the time Agent Jolley applied for the search warrant, Judge Cobb knew that Cariani had copied files related to the REVS program from SNC computers to unapproved storage devices between December 2014 and March 2015. (ECF No. 40-1 at 11). After copying the files, Cariani abruptly submitted a resignation letter to SNC, which contained "complaints about SNC and its leadership." (*Id.*) Prior to resigning, on March 25, 2015, Cariani booked travel to a foreign country with his girlfriend when he had never previously left the United States. (*Id.*) Just from these facts, Judge Cobb knew that Cariani was angry with SNC, he had been copying thousands of files to unapproved storage devices for several months prior to his departure from the company, and while he was copying these files, he planned to travel to a foreign country for the first time in his life. As far as law enforcement knew at the time, Cariani only had one email address – the one he used to book travel to Italy. Given Agent Jolley's prior knowledge that foreign intelligence services use email to attempt to obtain trade secret information from potential sellers, it was reasonable for Judge Cobb to conclude that evidence of such activity may be found in Cariani's email. *See U.S. v. Taylor*, 716 F.2d 701, 706 (9th Cir. 1983) ("the affidavit need not establish that it was 'more likely than not' that evidence would be found or preclude other innocent interpretations").

The most harming fact to Cariani and most indicative that suspicious activity was afoot was his erratic behavior during his exit interview with SNC. The interview was unusual from the start because Cariani had inexplicably refused to meet with SNC personnel in person, which resulted in the interview being conducted on the phone. (ECF No. 40-1 at 11). When SNC

personnel asked about the file transfers, Cariani initially "could not recall" whether or not he had copied company files using unapproved external devices, but he changed his story after he was confronted with the information from his log report, instead saying that he may have done so. (*Id.*) When SNC pressed him on the issue, Cariani became evasive, refusing to confirm if he downloaded the files and if he did, what he did with them. (*Id.* at 12). Cariani eventually hung up on the interviewers. (*Id.*) Cariani's argument that there was no connection between his Apple email account and allegations of stealing trade secrets ignores the suspicious timing of Cariani's activities in early 2015, his behavior during his exit interview, and the fact that email is often used by foreign intelligence services to obtain trade secrets. The job of the Magistrate Judge is to view the search warrant and accompanying affidavit under the totality of the circumstances, not to view facts and draw inferences from them in isolation. *Illinois v. Gates*, 462 U.S. 213, 238 (1983). Judge Cobb did so here, and he properly found that there was probable cause to believe that evidence of a crime would be found in Cariani's email account.

### 2. Particularity and Overbreadth

In the alternative, Cariani argues that the search warrant directed at his Apple email account was "fatally overbroad" and lacked particularity. (ECF No. 30 at 8). The search warrant in this case includes two attachments, and Cariani focuses his argument on Attachment B. Attachment B is divided into two sections, (1) information to be disclosed by Apple and (2) information to be seized by the government. (ECF No. 40-1 at 5–6). The information Apple was required to disclose to the government included, *inter alia*, the "contents of all emails associated with the account" and "[a]ll records or other information regarding the identification of the account." (*Id.* at 5). The information that the government was to seize included:

> All information described above in Section I that constitutes fruits, contraband, evidence, and instrumentalities of violations of [18 U.S.C. §§1831, 1832], those violations involving Peter Cariani and occurring after December 1, 2014, including for [his account], information pertaining to the following matters:
>
> (a) "Sierra Nevada Corporation," "REVS," "MATLAB," "SNC," "Fixed Wing," "FW," IRAD," "internal research and development," "Peter Cariani," "Source code," "Subversion," "technical documents," "rotary wing," "RW," "Todd Grossaint," "Real

8

Poitras," "FM program," "REVS FM," "Modified RSU, "Alisa Bindel"

(*Id.* at 6). Cariani argues that the search warrant "authorized the un-differentiated search and seizure" of his entire Apple email account without any temporal or subject matter limitations. (*Id.* at 10).

To satisfy the particularity requirement of the Fourth Amendment, the warrant must adhere to two separate but related rules. First, the warrant must describe the place to be searched or the things to be seized with sufficient particularity, accounting for "the circumstances of the case and the types of items involved." *U.S. v. Weber*, 923 F.2d 1138, 1342 (9th Cir. 1990) (quoting *U.S v. Spilotro*, 800 F.2d 959, 963 (9th Cir. 1986)). To satisfy the second rule, the scope requirement, the scope of the warrant must be limited by the probable cause on which the warrant is based. *U.S. v. SDI Future Health, Inc.*, 568 F.3d 684, 702 (9th Cir. 2009). Factors that the courts look at to see if these two requirements are met include: (1) whether there was probable cause to seize particular items in the warrant; (2) whether the warrant sets out objective standards by which executing officers can determine which items are subject to seizure, and (3) whether the government could have described the items with more particularity when the warrant was issued. *U.S. v. Wong*, 334 F.3d 831, 836–37 (9th Cir. 2003) (citing *U.S v. Spilotro*, 800 F.2d 959, 963 (9th Cir. 1986)).

After reviewing the search warrant, the Court finds that it is not overbroad, and the items to be seized within are described with sufficient particularity. As an initial issue, Cariani confuses the difference between disclosure and seizure. While the warrant required Apple to disclose the entire contents of Cariani's email address as electronically stored information ("ESI"), it only allowed the government to seize content starting from December 1, 2014, and only the content related to the identified search terms. (ECF No. 40-1 at 6). The Ninth Circuit has repeatedly rejected the argument Cariani makes here, most notably in *U.S. v. Flores*, 802 F.3d 1028 (9th Cir. 2015). There, the government had a warrant to search the Facebook account associated with the defendant's name and email address and to only seize evidence of the two offenses listed in the warrant. *Id.* at 1044. The warrant authorized Facebook to provide the government with the entire contents of the account, and the government then seized content related to the two criminal offenses alleged. *Id.* Applying the three factors stated above, the Ninth Circuit found that the

9

warrant was not overbroad because it only allowed the government to seize information relevant to the charged offenses and it contained objective standards for differentiating between relevant and irrelevant information. *Id. Flores* is directly on point and controlling law.

Cariani attempts to differentiate *Flores* by arguing that his case involves an email account rather than a Facebook account,[1] but given that Facebook stores chat logs and allows users to privately message one another in a manner substantially similar to email, the difference is trivial at best. He also argues that the *Flores* case did not determine whether the warrant was overbroad because of a lack of temporal restriction,[2] which is correct but not relevant in his case because his warrant did contain a temporal limitation. (ECF No. 40-1 at 6). One district court with an arrest warrant nearly identical to the one in *Flores* but with a temporal limitation found that the search warrant was not overbroad. *U.S. v. Bundy*, 195 F.Supp.3d 1170, 1175 (D. Or. 2016) ("[t]he [w]arrant in this case, therefore, was narrower than the one approved by the Ninth Circuit in *Flores*.").

Turning to the three elements from *Wong*, as the Court has already determined, the government had probable cause to believe that Cariani's Apple email account would contain evidence that he was involved in either selling or otherwise disseminating SNC's trade secrets in violation of 18 U.S.C. §§1831 and 1832. The scope of the warrant was limited to just this email account, not to any electronic devices Cariani may have had, other email accounts, or any social media accounts. The warrant also sets "objective standards" by which federal agents could search through Cariani's emails to find responsive content, such as the temporal limitation (December 1, 2014, when Cariani began transferring REVS files to unauthorized devices) and specific search terms, such as "REVS" and "fixed wing." (ECF No. 40-1 at 6). These terms relate directly to the information that Cariani is alleged to have stolen. Finally, the search terms were sufficiently particular based on the facts of this case. They encompass the technology Cariani is alleged to have stolen ("REVS," "MATLAB," "Fixed Wing"), common terms that relate to the technology ("technical documents," "internal research and development"), and the names of Cariani and

---

[1] (ECF No. 44 at 10).
[2] (*Id.*)

10

Bindel, the two people the government knew at the time were traveling to Italy. (*Id.*) These terms clearly satisfy the particularity requirement. *See U.S. v. Mann*, 389 F.3d 869, 877 (9th Cir. 2004) ("While a search warrant must describe items to be seized with particularity sufficient to prevent a general, exploratory rummaging in a person's belongings, it need only be reasonably specific, rather than elaborately detailed.").

### 3. Stale Information

Cariani's final argument relates to information the FBI learned following the issuance of the search warrant on May 26, 2015. He argues that the FBI agents should have provided Judge Cobb with an update of their investigation after three of Cariani's former coworkers told investigators that he had told them that he planned to travel to Italy on a family vacation. (ECF No. 30 at 16). He continues on to say rather "than correct or supplement the affidavit, the affiant waited for the results of the search warrant to arrive and let the stale inference linger that the purpose of [Cariani's] trip might be illicit." (*Id.*)

A defendant may succeed in challenging the validity of a warrant if he can show that a false statement was knowingly and intentionally, or with a reckless disregard for the truth, included in an affidavit in support of probable cause and the falsified information was necessary to the finding of probable cause. *Franks v. Delaware*, 438 U.S. 154, 155–56 (1978). "[The defendant] should point out specifically the portion of the warrant affidavit that is claimed to be false; and they should be accompanied by a statement of supporting reasons. Affidavits or sworn or otherwise reliable statements of witnesses should be furnished, or their absence satisfactorily explained. Allegations of negligence or innocent mistake are insufficient." *Id.* at 171. Here, Cariani has alleged that rather than a false statement being included in Agent Jolley's affidavit, Agent Jolley withheld information from Judge Cobb. The framework is the same – Cariani must make a "substantial preliminary showing" that the affidavit contained a misleading omission and that the omission resulted from a deliberate or reckless disregard from the truth. *U.S. v. Kyllo*, 37 F.3d 526, 529 (9th Cir. 1994). He must also show that if not for the omission, the affidavit would have been insufficient to establish probable cause. *Id.*

Cariani's argument lacks merit. He asserts that the reason for the trip was a "pre-planned vacation with family and friends," but the interviews he points to contain no such information. (ECF No. 30 at 15). In one interview conducted on June 24, 2015, one of Cariani's former coworkers stated that Cariani had talked about traveling to Europe after he left the company. (ECF No. 40-5 at 3). Another former coworker, in a June 19, 2015 interview, mentioned Cariani wanting to go "jeeping" in Utah and then travel to Italy. (*Id.* at 5). In a June 12, 2015 interview, a third coworker stated that Cariani had talked about taking a trip to Italy. (*Id.* at 7). None of the witnesses mentioned that the purpose for the trip was a family vacation, and Cariani fails to cite to any evidence in the record to support his assertion. Additionally, the interviews were conducted following the execution of the first search warrant Cariani contests. It is unclear to the Court how Agent Jolley could have hidden information from Judge Cobb "as the search warrant results were pending"[3] when he conducted the interviews several weeks after the search warrant was executed. These two facts alone defeat Cariani's *Franks* argument.

Moreover, Cariani has not demonstrated how including the purported reason behind his trip to Italy would strip Agent Jolley's warrant of probable cause. He merely states in conclusory fashion that the failure to include such information was a material omission, which is insufficient to meet the omission standard the Ninth Circuit offered in *Kyllo*. (ECF No. 30 at 16). The argument that three of Cariani's former coworkers told Agent Jolley that the purpose of the Italy trip was a family vacation (which, according to his FD-302s, they did not do), does not "prove" the purpose of the trip, as Cariani insinuates. Instead, these statements are only evidence that Cariani told them why he was going on the trip. An individual who wishes to engage in the illegal sale of trade secrets hardly would want his soon to be ex-coworkers to know of his plan. *Ramirez v. City of Buena Park*, 560 F.3d 1012, 1024 (9th Cir. 2009). ("Rarely will a suspect fail to proffer an innocent explanation for his suspicious behavior."). In any event, an alternative explanation for Cariani's trip to Italy does not obviate the suspicious facts within Agent Jolley's affidavit. *See id.* ("innocent explanations for…odd behavior cannot eliminate the suspicious facts from the probable cause calculus.").

---

[3] (ECF No. 30 at 16).

**B. Second Motion to Suppress (ECF No. 36)**

Cariani's second motion to suppress seeks to suppress several pieces of evidence: (1) statements he made to Agents Stallings and Cook during the October 21, 2015 interview; (2) the flash drives recovered from the interview; (3) the voicemails he left Agent Jolley the night of the interview, and (4) the iPad and laptop recovered the morning after the interview. (ECF No. 36 at 4). Cariani's main argument is that he was subjected to a custodial interrogation when he was interviewed by Agents Stallings and Cook, so any statements he made or evidence he produced during the interrogation must be suppressed because he was never read the *Miranda* warning. (*Id.* at 4-5). He further argues that the voicemails and other electronic devices must be suppressed because their production stemmed from unlawful law enforcement conduct, namely the custodial interrogation without an advisement of his rights. (*Id.* at 6).[4]

To determine whether a suspect is in "custody," a court must examine all the circumstances surrounding the interrogation, "but the ultimate inquiry is simply whether there [was] a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." *Stansbury v. California*, 511 U.S. 318, 322 (1994) (quoting *California v. Beheler*, 463 U.S. 1121, 1125 (1983)). Thus, the court must (1) examine the circumstances surrounding the interrogation, and (2) determine whether a reasonable person would have felt that he was not permitted to leave. *Yarborough v. Alvarado*, 541 U.S. 652, 662–63 (2004). Relevant factors include the location of the questioning, its duration, statements made during the interview, the presence or absence of physical restrains during the questioning, and the release of the interviewee at the end of the questioning. *Howes v. Fields*, 565 U.S. 499, 509 (2012) (collecting Supreme Court cases). The initial determination of custody depends on the objective circumstances of the interrogation, not on the subjective views of either the police officer or suspect. *Stansbury*, 511 U.S. at 323. Stated

---

[4] Cariani also requests that the Court suppress statements he made during two separate interviews he conducted with the FBI on November 3 and November 23, 2015. (ECF No. 36 at 7). These interviews were conducted well-after the October 21 interview he had at Logan International. During the Court's evidentiary hearing, Cariani never testified about the nature and circumstances of these two interviews. In fact, defense counsel objected when government's counsel asked Cariani about these interviews on cross examination. Because Cariani failed to adduce any evidence about these interviews during his opportunity to do so, and his briefing on this issue is largely unsupported by citations to evidence, the Court will deem this argument waived.

13

differently, a "policeman's unarticulated plan has no bearing on the question whether a suspect was in custody at a particular time...the only relevant inquiry is how a reasonable man in the suspect's position would have understood the situation." *Id.* at 323–24 (quoting *Berkemer v. McCarty*, 468 U.S. 420, 442 (1984)). An individual who is a suspect in a crime is not per se "in custody" for *Miranda* purposes. *Beckwith v. U.S.*, 425 U.S. 341, 346–47 (1976). Mere police questioning does not constitute a seizure. *Florida v. Bostick*, 501 U.S. 429, 434 (1991) (citing *Florida v. Royer*, 460 U.S. 491 (1983)).

Addressing the factors that the Supreme Court listed in *Howe*, the Court finds that Cariani was not subjected to a custodial interrogation. As to the physical location of the interview, Cariani was approached by Agent Darling and another law enforcement officer in the airport and asked if he had time to answer some questions. An airport, even on the ramp connecting an airplane to a gate, is a public location and inherently non-coercive. *See U.S. v. Woods*, 720 F.2d 1022, 1029 (9th Cir. 1983) (airport cocktail lounge was a "public place" for the purposes of a custodial interrogation analysis). Agent Darling then asked Cariani if he had time to answer some questions, to which Cariani agreed. There is no evidence to indicate that Cariani was told that he had to answer questions or that he was coerced into going with Agent Darling in any way. The fact that Cariani voluntarily accompanied Agent Darling to the FBI offices is a strong indicator that he was not subjected to a custodial interrogation. *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977); *U.S. v. Crawford*, 372 F.3d 1048, 1059 (9th Cir. 2004).

As to the FBI conference room where the interview itself took place, testimony at the evidentiary hearing demonstrated that it was well-lighted, had large windows overlooking the airport runway, and had the appearance of a normal business conference room (as opposed to a police interrogation room). Cariani testified that he was seated across a table from Agents Stallings and Cook, his back to the door he entered through. This door was not locked, meaning that there was nothing preventing Cariani from standing up and exiting the conference room at any time. The fact that Cariani was unrestrained throughout the interview, which took place in a business setting, is another strong indicator that he was not subjected to a custodial interrogation. *See U.S. v. Fata*,

2012 WL 1715496, at *12–13 (D. Nev. Mar. 15, 2012) (interview taking place in an unlocked ATF conference room with a large conference table was not indicative of a custodial interrogation).

The fact that Cariani was released following the interview is also a strong indicator that he was not in custody. Not only was Cariani allowed to leave following the interview, but the FBI agents even drove him to his destination. Prior to the interview, Cariani himself appeared to recognize the fact that he would be released following his interview; he testified that prior to answering any questions, he called his parents to tell them he "had" to answer questions from the FBI and that he would "find a ride" home (rather than them waiting to pick him up). A defendant who believes that he is not free to leave and is under arrest would hardly need to find transportation following the police interrogation. This factor strongly weighs in favor of finding that Cariani was not subjected to a custodial interrogation. *California v. Beheler*, 463 U.S. 1121, 1122–23 (1983).

The only factor that could arguably weigh in favor of a finding of a custodial interrogation is the duration of the interview. Agent Stallings testified that the interview lasted approximately an hour and a half, whereas Cariani estimated that it lasted anywhere from an hour and a half to two hours. There does not appear to be a bright line rule determining at what duration an interview turns into a custodial interrogation. *See, e.g., U.S. v. Crawford*, 372 F.3d 1048, 1052 (9th Cir. 2004) (defendant who was interrogated for "more than one hour" was not in custody); *U.S. v. Wauneka*, 770 F.2d 1434, 1439 (9th Cir. 1985) (defendant who was interrogated for "over an hour" was in custody). While Cariani's interview was on the longer side, none of the other objective facts surrounding the interview support a finding that Cariani was in custody.

During his testimony, Cariani repeatedly stated that he felt that he had no choice but to stay and answer the questions posed by the FBI. But as demonstrated above, a reasonable person, given the objective circumstances surrounding Cariani's interactions with law enforcement, would feel that he could in fact terminate the encounter and leave the scene without any negative consequences. Cariani undermined his credibility by making unsupported and conspiratorial remarks about the FBI. For instance, he referred to the FBI as "the mob," stating that they are a "United States government agency that has how [sic] much power they want, and they're after me, and they can do whatever damage to my life they want to." He accused the FBI of intimidating his

15

girlfriend (Bindel) and tapping both his and his brother's phones. He also believed that the FBI was actively trying to prevent him from getting a job, as he was unemployed in the fall of 2015 following his firing from SNC. None of these accusations find any support in the record and do nothing but cast doubt on his version of events.

Based on the record before the Court, the Court finds that Cariani was not in custody during his interview with Agents Stallings and Cook. The Court will deny his motion to suppress the evidence obtained during that interview and any subsequent evidence obtained as a result of that interview.

### III. Conclusion

IT IS THEREFORE ORDERED that defendant Peter James Cariani's motions to suppress (ECF Nos. 30, 36) are **DENIED**.

IT IS SO ORDERED.

DATED this 10th day of October, 2019.

_____
LARRY R. HICKS
UNITED STATES DISTRICT JUDGE